### HENTZ et al. v. PIEDMONT COTTON CO.

(Circuit Court of Appeals, Fourth Circuit. February 5, 1924.)

No. 2170.

Brokers ⚫⟿72—Brokers held entitled to recover from principal loss on cotton bought on Liverpool Exchange.

Plaintiffs, as brokers in May, 1914, bought for defendant, but in their own name, 2,200 bales of cotton in Liverpool for Oct./Nov. delivery. About August 1st, owing to war conditions, the Liverpool Cotton Exchange, of which both parties were then associate members, closed and transferred all "Oct./Nov." contracts to "Jan./Feb." Defendant, though insisting on the illegality of the action of the Exchange, continued to exercise authority over the contracts, and, failing to put up margins asked for by plaintiffs, the latter carried the contracts at a cost to them of $45,000, in margins advanced until February 15th, when they sold the cotton at a loss of over $30,000. *Held*, that plaintiffs were agents for defendant throughout the transactions, and that under the evidence they were not chargeable with any fault which deprived them of the right to recover the loss from defendant.

Waddill, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of North Carolina, at Greensboro; James E. Boyd, Judge.

Action at law by Henry Hentz and others, partners as H. Hentz & Co., against the Piedmont Cotton Company. Judgment for defendant, and plaintiffs bring error. Reversed and remanded.

J. S. Duncan and R. C. Strudwick, both of Greensboro, N. C. (K. M. Brim, of Greensboro, N. C., on the brief), for plaintiffs in error.

J. M. Robinson, of Charlotte, N. C. (Cansler & Cansler, of Charlotte, N. C., on the brief), for defendant in error.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. This controversy is the direct result of abnormal conditions brought on by the World War. The plaintiffs in error were plaintiffs below and will be so styled here. They are citizens of New York, and their firm or its predecessors had for more than a half a century carried on the business of cotton agents and brokers. For a number of years they had had agreeable business relations with the defendant, the Piedmont Cotton Company, a North Carolina corporation.

In May, 1914, by direction of defendant, plaintiffs bought in Liverpool for its account in all 2,200 bales of cotton for Oct./Nov. delivery

---

⚫⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

at an average price in English money equivalent to a shade over 12.8 cents in our currency. Under circumstances to be presently stated, they carried the cotton until the 15th of the succeeding February, when, defendant being unable to comply with their calls for margins, they sold it and found themselves largely out of pocket. Plaintiffs figured that defendant for the difference between the price at which the cotton was bought and that at which it was sold, and for commissions, interest, and carrying charges, owed them a net balance of over $32,000 after crediting it with all the cash, $3,000, that it ever paid on the transaction, and the sum of a couple of hundred dollars otherwise realized by the plaintiffs. To recover such balance this suit was brought. At the close of plaintiffs' evidence the learned judge below directed a verdict for the defendant because in his view certain action taken by the Liverpool Cotton Association, Limited, hereafter for brevity called the Exchange, had relieved it from liability.

The transactions here in controversy began on May 8, 1914, when defendant by letter directed plaintiffs to sell in New York 1,936 bales of cotton and to buy in Liverpool 2,000 bales for Oct./Nov. delivery. In it defendant said:

"Please understand that you have the fullest discretion and the widest latitude in handling the orders in just whatever manner you think best."

Plaintiffs did as they were told, and on May 21, defendant in acknowledging the receipt of their reports to that effect said:

"Permit us to express our hearty satisfaction over the manner in which you have handled these operations for us and to say that our expectations in intrusting the transactions to you have been entirely verified."

On May 26 defendant ordered the plaintiffs to buy in Liverpool 200 more bales for the same delivery, and this, too, was done. These purchases were made by plaintiffs in their own name in accordance with what appears to have been the custom of the trade and the understanding of both parties as the correspondence and evidence abundantly show. They bound themselves to pay therefor upwards of $135,000. Nevertheless in passing upon what afterwards took place, it must not be forgotten that plaintiffs bought the cotton as defendant's agents. If its price went up, the gain would be defendant's. If there was a fall and defendant could not, or would not, pay, the plaintiffs must, and theirs would be the loss unless by suit, they could recover it from the defendant. Ordinarily, in such transactions the broker protects himself by requiring margin from his principal. In May, 1914, the relations between the parties had been so long established and had been so satisfactory that plaintiffs asked for no cover. From May 26 to August 4, so far as the record discloses, neither party had occasion to communicate with the other, but it was during this fatal period that the four horsemen of the Apocalypse were let loose upon mankind and thereafter overturning followed overturning. By the 31st of July, in America as in Europe men felt that war was at hand. In New York the stock as well as the cotton exchange closed its doors and the Liverpool Exchange did the like. It was weeks and months before any of them reopened. Between the purchases of May and the end of July, the

market price of cotton in Liverpool had fallen not quite half a cent a pound, so that if defendant's contracts had been closed out just before the Exchange ceased to function, it would have lost $4,840, exclusive of commissions and charges. The closing of the Liverpool Exchange was known in this country on July 31 by noon, Eastern Standard time, or shortly thereafter. On the next day, August 1, Germany declared war on Russia. On Sunday, August 2, it served its fatal notice on Belgium. On the afternoon of August 4, the British Parliament was informed that Germany had been told that before midnight came to Berlin, the Imperial Government must agree to respect the neutrality of Belgium or consider itself at war with the United Kingdom. Our Eastern Standard time is behind that of Greenwich by five hours and that of Berlin by six, so that the American afternoon papers of August 4 carried the news that the British ultimatum had been delivered. All felt what the answer would be and that when the 6 o'clock bells struck on the Atlantic seaboard of America, Great Britain would be at war with the most powerful military monarchy of all time.

For four days defendant had known that the Exchange was closed, but it was not until 5:50 p. m. on August 4, just 10 minutes before the British ultimatum expired, that it sought to communicate with plaintiffs by telegraphing them instructions, "If practical sell to close purchases made at Liverpool at closing quotations of Friday." This dispatch reached plaintiffs on the forenoon of the next day, August 5. Unknown at that time to either of the parties to this litigation, the directors of the Exchange had as early as August 3 suspended until further notice all trading in futures and all tenders and settlements for future contracts and had prohibited all trade in spot cotton until arrangements could be made to safeguard the interests of all concerned. On August 4 and in view of the difference in time, hours before defendant sent its telegram, the same board resolved that all members having open contracts for themselves or clients in deliveries from Sept./Oct., Dec./Jan. inclusive, should transfer them into Jan./Feb.

Plaintiffs have been associate members of the Exchange since 1895. The defendant became one on the 21st of May, 1913, and did not resign until September 30, 1914. Associate members while to some extent subject to the rules of the Exchange in so far as concern their dealings with it, or its members, had no privileges of membership except that of having their business done at a lower rate of commission than was charged outsiders. When plaintiffs, on the morning of August 5, received defendant's telegram of the preceding afternoon, they cabled the instruction it gave to their Liverpool correspondents and by letter later in the day, advised defendant that they had done so but that a cabled reply told them there was then no market in Liverpool although after that day, it might be possible to arrange the matter as defendant desired and its order to do so would be considered in force until canceled.

The record shows that from July 31 until the closing of the deal in the succeeding February, there never was a moment at which the plaintiffs, or any one else for that matter, could have sold the cotton at the closing price of July 31. The plaintiffs first learned that the directors of the Exchange had transferred all Oct./Nov. contracts to Jan./Feb.

from an item in the New York Journal of Commerce Bulletin for August 7. They at once told the defendant. On the 4th of November the directors of the Exchange again postponed the fulfillment date of outstanding contracts by transferring all of them calling for Jan./Feb. delivery to May/June. It was not until about a month later that the news of that action reached the defendants and then it came through an incidental reference in a letter of the plaintiffs who had known of it for some time. They had not previously mentioned it to the defendant because they supposed that it, like themselves, had received the Exchange's circular relating to it. They knew that defendant had been an associate member and were unaware that it had resigned a month or more before.

From August to February defendant never ceased to complain that its cotton was not sold at the closing price of July 31 and never failed to protest against what it felt and said was the injustice and the illegality of the action of the Exchange in twice transferring the delivery dates of contracts without regard to the wishes or the rights of the parties to them. As to both matters, it was in the position of Rachael, weeping for her children and refusing to be comforted because they were not, but its complaints were as destitute as her tears of any practical suggestion as to how to undo that which had been wrongfully done.

So far as concerns the rights of the parties to the pending controversy as against each other, it matters naught that nothing in the articles of Association of the Exchange or in its rules confer upon its directors the power to transfer from one month to the other the right to demand deliveries under contracts, and that the attempted confirmation by the members of the Exchange of this unauthorized action was ineffective to change the legal rights of parties to agreements entered into previously. However difficult it may be to justify in legal theory any of these proceedings, there is no question that in point of fact they created a condition which as the defendants admitted in their letter of November 13 to the plaintiffs both of them "had been powerless to prevent." Legal action by either of them against the English sellers of the cotton or against the Exchange or its officials would have been of no avail. Before any such suit could have been brought to trial, Parliament stepped in and by statute of July 29, 1915, expressly made valid any action taken by any cotton association before the passage of the act for altering the date of delivery under any contracts made subject expressly or impliedly to the rules of the association by any person whether a member of the association or not for the future delivery of cotton. Parliament is not subject to the restrictions of any written constitution, and there was no question that every British court would have given effect to the enactment.

Defendant says even so, if plaintiffs wished to hold it liable they should not have ratified the action of the Exchange as they did when at the request of the Liverpool sellers they signed new contracts which substituted the delivery times fixed by the Exchange for those of the original bargains. From this point of view, it is immaterial that its right to demand that plaintiffs should leave themselves free to stand on

the May agreements as they were first written was of little worth from a practical standpoint. Admitting that the vendors were residents of the United Kingdom, that no action could be maintained against them there, there was still a chance that they might some time be in this country and, if not, that they might have property or credits here subject to attachment. Defendant argues that it was entitled to have left open that opportunity, small though it was. Perhaps, had it been both able and willing to protect plaintiffs against the loss that such a course might have brought upon them, but that is precisely what defendant repeatedly told plaintiffs it could not do.

As early as August 5, plaintiffs asked the defendant for margin. It was not until this request had been repeated that defendant on the 14th said that to its great regret, its financial position made a remittance impossible. On the 19th, plaintiffs asked for at least $10,000. Defendant again answered that such payment was impossible. During the succeeding six months, plaintiffs' demand for cover and defendant's statements of its inability to furnish it were the refrain of the voluminous correspondence between them.

Since May when plaintiffs had obligated themselves to pay $135,000 for the cotton bought at defendant's request and for its account, the greatest catastrophe of recorded time had come upon an unsuspecting world. Plaintiffs had been compelled to forward to Liverpool $45,000 of their own money as margin on the cotton they were carrying for defendant. It was not until December 21, 4½ months after plaintiffs had first asked defendant for money, that any was furnished, and then $3,000 was all that was forthcoming. That was a trifle over 2 per cent. of the price for which defendant, seven months before, authorized plaintiffs to obligate themselves. Not another penny did defendant ever put up. Doubtless it was not in a financial position to do more than it did. The World War had put it out of its power to live up to its engagements, precisely as the same calamity had made literal performance by the Exchange impossible. However that may be, there is no doubt that plaintiffs were left to hold the bag. They had reason for anxiety. Every time cotton went down 1 cent a pound, the value of defendant's purchase fell almost $10,000. The record shows that at one time during the period through which plaintiffs carried the cotton, the price was as low as 4.04d., or a shade under 8.1 cents per pound. The 2,200 bales for which plaintiffs were bound to pay $135,000 if then resold, would have brought not exceeding $90,000. No one can tell what would have happened had the Exchange attempted to keep open, and there is no occasion to speculate as to what the consequences might have been, for by no possibility can plaintiffs be held responsible for any of them. As has already been pointed out, defendant's complaint is that plaintiffs assented to the transfer of delivery dates directed by the Exchange. Did this postponement of delivery do the defendant any harm?

The May contracts called for Oct./Nov. deliveries. If the Exchange had left them alone, the defendant during these months would have been called upon to receive the 2,200 bales and to pay $135,000 for them. It would not, of course, have needed to have by it all or even

the greater part of this sum. It might have sold the cotton or the contracts at the then market price. During most if not all of the original delivery months, there was little chance of being able to sell at all. For some reason the Exchange had imposed strict limitations upon dealings in cotton. Perhaps it knew, or thought it knew, that there was but a limited demand for cotton for consumption, and that unrestricted competition for the few orders that were available would result in a disastrous decline in price. For that, or some other reason, it fixed the price at which cotton could be bought or sold, and, as even at that figure there were more sellers than buyers, it required the would-be vendors to ballot; that is, to draw lots for the privilege. On October 14, plaintiffs in this way were able, with defendant's consent, to sell at 5d. per pound 100 bales. They might in the same way have sold 1,100 more, but would have gotten for it only 4.25d. per pound, a price which defendant declined to accept. 5d. or 10 cents per pound was at the rate of $48 for a 480-pound bale. Defendant had contracted to pay about $61.50. On 2,200 bales its loss would have been $29,700. The record appears to indicate that for any considerable amount of cotton, the best price that could have been obtained was 4.25d. per pound. At that figure, defendant's loss would have been $41,780. If it had sought to prevent such a sacrifice, it could only have done so by providing a margin sufficient to induce somebody to carry the cotton for it, and such a margin would have somewhat exceeded the then difference between the original contract price and that which prevailed in the market during October and November. It follows, if the cotton had been tendered to the defendant in either of these months, it would have been called upon to put up from $30,000 to $45,000. During all that time, it doubtless with truth protested its inability to raise $5,000. Indeed, the record shows that although it complained with so much bitterness of the postponement of delivery dates by the Exchange, it really sought a still further delay. It urged plaintiffs to have its deliveries postponed from May/June, 1915, as the Exchange had fixed them, to the fall of that year or to the early winter of 1916, but it was unable to supply the margin of $15,000 which plaintiffs required, although that sum was less than half the difference between the contract and the then market price.

On February 18, 1915, the provisions of the United States Cotton Futures Act, 38 Stat. 693, became effective. There was a question whether under the eleventh section of it, the cotton which plaintiffs were carrying for defendant might not become subject to a tax of 2 cents per pound, or about $20,000 in all. Plaintiffs were inclined to believe that cotton prices were not likely to advance much in the immediate future. Their efforts to get the defendant to put up satisfactory margin had failed. They made up their minds to close out the deal unless defendant at once paid something. This the latter was still unable to do, and so on the 15th of February plaintiffs sold with the result already mentioned.

From August on, defendant never ceased to complain of what the Exchange had done; it declared it did not regard that action as binding on it, but it never said or implied that it washed its hands of the

deal. It assumed authority to cancel the tentative sale of the 1,100 bales under the ballot and plaintiffs admitted its unquestioned right to do so. It never before the final sale of the cotton allowed itself to get into a position in which it could not have demanded any profit which a sudden advance of the market might have yielded. When plaintiffs telegraphed it on February 15 that they had instructed their Liverpool correspondents to sell, defendant replied that such action was unauthorized and was disallowed by it, a statement obviously inconsistent with any theory that their rights in the cotton and their obligations for it had terminated months before.

All that has been said is based upon the record as it stands and all of that was put in by the plaintiffs. Upon a second trial, the evidence may show that things which now stand unchallenged are in fact, greatly disputed, but from what has been said we think the plaintiff was entitled to recover on the evidence adduced.

The judgment below must be reversed, with costs, and the case remanded in order that a new trial may be had.

Reversed.

WADDILL, Circuit Judge, dissents.